Sue E. HATTON, Plaintiff,

v.

James C. HUNT, et al., Defendants.

Carolyn HOLLAND, Plaintiff,

v.

UNIVERSITY OF TENNESSEE, Defendant.

Nos. 90–2279–TUA, 90–3007–TUB.

United States District Court, W.D. Tennessee, W.D.

Sept. 17, 1991.

Donald A. Donati, Memphis, Tenn., for Hatton.

Hite McLean, Jr., Memphis, Tenn., for Holland.

Ronald C. Leadbetter, Odell Horton, Jr., University of Tennessee, Knoxville, Tenn., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

TURNER, District Judge.

Plaintiffs seek relief in this action pursuant to the Equal Pay Act, 29 U.S.C. § 206(d). In addition, plaintiff Sue Hatton also seeks relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* More specifically, plaintiffs are alleging that defendant University of Tennessee, Memphis, has discriminated against them on the basis of sex by paying them wages and compensation at a rate substantially lower than that paid to their male counterpart for performing equal work in positions requiring substantially equal skill, effort and responsibility, and which are performed under similar working conditions.

### FINDINGS OF FACT

1. The University of Tennessee, Memphis ("University") is an agency of the University of Tennessee (which is a public educational institution) and the State of Tennessee, located in Memphis, Shelby County, Tennessee.

2. James C. Hunt is the Chancellor of the University and Dr. Robert L. Summitt, Jr. is the Dean of the College of Medicine.

3. There are several Colleges within the University, the largest of which is the College of Medicine. In May of 1988, the College of Medicine was composed of 16 clinical and 5 non-clinical departments. The 5 non-clinical departments are collectively referred to as the "Basic Sciences Departments" and include: 1) Anatomy and Neurobiology, 2) Biochemistry, 3) Microbiology and Immunology, 4) Pharmacology, and 5) Physiology and Biophysics.

4. In May 1988, each of these Basic Sciences Departments had an administrative manager, whose title was Assistant to the Chairman.

5. Prior to May of 1988, the Assistant to the Chairman positions in the Basic Sciences Departments had always been permanently filled by females. In May of 1988, Gene Banton, a male, was hired as Assistant to the Chairman in the Department of Microbiology and Immunology.

6. Plaintiff Sue E. Hatton is a female citizen of the United States, and has been employed by the University since April of 1959. Since 1977, plaintiff Hatton has performed in the role of Assistant to the Chairman for the Department of Pharmacology in the College of Medicine, although the job acquired this title only in 1980.

7. From 1959 to 1969, plaintiff Hatton was a Research Technician in the Department of Physiology. In 1969, she was promoted to Research Assistant. These positions were non-managerial.

8. Plaintiff Carolyn Holland is a female citizen of the United States, and has been employed by the University since March 1, 1974. Since 1978, plaintiff Holland has performed in the role of Assistant to the Chairman for the Department of Physiology and Biophysics in the College of Medicine.

9. From 1974 to 1978, plaintiff Holland was employed by the University's Cancer Center as a secretary. In 1978, she was promoted to Office Services Supervisor, the earlier title of the position she now holds.

10. At the time of the commencement of this action, six University employees were employed in the position of Assistant to the Chairman. Five of those individuals were employed in the College of Medicine.

11. On February 3, 1989, Sue Hatton filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that the University paid her less wages than similarly situated males in violation of both the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII, 42 U.S.C. § 2000e *et seq.*

12. After investigation, the EEOC issued a Determination finding that a male (Gene Banton) was paid more than Sue Hatton and three other women, including Carolyn Holland, for performing equal work requiring substantially equal skill, effort and responsibility, and which was performed under similar working conditions.

13. It is undisputed that plaintiffs Hatton and Holland have both been exemplary managers in their respective positions for a number of years.

14. Dr. Murray Heimberg, Chairman of the Department of Pharmacology, completed "Performance Evaluation Review" reports on plaintiff Hatton on June 16, 1983, April 4, 1984, May 6, 1985, March 25, 1986, January 27, 1988, April 25, 1988, May 10, 1988, April 5, 1989, and April 26, 1990. In every one of these evaluations, plaintiff Hatton was rated as "exceeds expectations" in all of the evaluation areas, including: initiative, attitude, quality of work, job knowledge, versatility, planning, communication skills, administration, professional development, institutional commitment, and supervision of others.

15. The Performance Evaluation Review reports on Carolyn Holland also indicate that Carolyn Holland generally exceeds or meets expectations in all of the following evaluation areas: initiative, attitude, quality of work, job knowledge, versatility, planning, communication skills, administration, professional development, institutional commitment, and supervision of others.

16. Since May 4, 1982, Dr. Heimberg has made numerous requests to Dr. Summitt and the College of Medicine, asking that a substantial salary increase be authorized for Sue Hatton.

17. On May 4, 1982, Dr. Heimberg made a recommendation to Dr. Summitt that Sue Hatton be given a rating of meritorious and that Sue Hatton's salary for the 1982–83 academic year be increased 14% (by $2,978) to a total of $24,248. Dr. Summitt denied this request.

18. On May 17, 1985, Dr. Heimberg made a request to Dr. Summitt that Sue Hatton's salary be increased by $7,000 per year. Dr. Summitt denied this request.

19. On April 30, 1986, Dr. Heimberg made a request to Dr. Summitt that Sue Hatton's salary be increased by $7,000 per year for 1986–87. Dr. Summitt denied this request.

20. On May 2, 1986, Dr. Raymond H. Colson, then Associate Dean of the College of Medicine, responded to Heimberg's request, denying plaintiff Hatton the salary increase.

21. In his response, Colson described the process by which compensation levels are determined for exempt employees such as plaintiffs. According to Colson, the value of these positions is established by a campus committee, referred to as the Hay Committee.

22. Over the years, Carolyn Holland's supervisors have made numerous requests to Dr. Summitt and the College of Medicine asking that a substantial salary increase be authorized for her.

23. From 1982 to 1987, the College of Medicine attempted to keep the salaries of the five Assistant to the Chairman positions essentially equal.

24. Catherine Taylor performed in the role of Assistant to the Chairman in the Department of Microbiology and Immunology from January 1, 1977 until October 2, 1986.

25. In 1985, Dr. Terrance Cooper, Chairman of the Department of Microbiology and Immunology, recommended a $4,788 salary increase for Catherine Taylor in order to bring her salary in line with the other Assistants in the Basic Sciences Departments. Raymond Colson approved this request and Mrs. Taylor's salary was increased by $4,788 on February 1, 1985.

26. On November 22, 1985, Dr. John Fain, Chairman of the Department of Biochemistry, recommended a $3,100 salary increase for Cheryl Colson in order to bring her salary in line with the other Assistants in the Basic Sciences Departments. This request was approved by the College of Medicine and the University.

27. Each Assistant to the Chairman at the University serves as the administrative manager of the department in which he or she is located.

28. Each Assistant to the Chairman has considerable discretion in performing the duties of the position. The amount of discretion may vary from position to position. In general, certain responsibilities are held by all Assistants to the Chairmen. These responsibilities include personnel management, fiscal management, facilities management and planning, and special projects and grants.

29. The core job functions of these five Assistant to the Chairman positions are the same.

30. From time to time different job functions are emphasized by different Basic Sciences Departments depending upon that department's particular needs, strengths, or weaknesses.

31. Notwithstanding variable emphases, the Assistant to the Chairman positions in the five Basic Sciences Departments involve substantially equal skill.

32. The Assistant to the Chairman positions in the five Basic Sciences Departments involve substantially equal effort.

33. The Assistant to the Chairman positions in the five Basic Sciences Departments involve substantially equal responsibility.

34. The Assistant to the Chairman positions in the five Basic Sciences Departments involve substantially equal working conditions.

35. Bobby Thomas was the Assistant to the Dean of the College of Medicine from 1986 through 1989. In that position, Bobby Thomas had regular contact and dealings with the five Assistants to the Chairmen in the Basic Sciences Departments.

36. According to Bobby Thomas, the five positions involved substantially equal skill, effort, and responsibility and the jobs were performed under similar working conditions.

37. According to Thomas, there is not a finer business manager in the Basic Sciences Departments than Sue Hatton.

38. Troy Vaughan is the Manager of the Wage and Salary Administration Program at the University.

39. In his capacity as Manager of the Wage and Salary Administration Program, Vaughan administers the salary program for non-exempt and some exempt positions.

40. According to Mr. Vaughan, the five Assistant to the Chairman positions involve substantially equal skill, effort, and responsibility, and the jobs are performed under similar working conditions.

41. An Administrative and Professional Position Data Questionnaire was prepared in November of 1988, and signed by each of the Assistants and their respective Chairmen in the Basic Sciences Departments.

42. The questionnaires describe in detail the actual jobs performed by each Assistant to the Chairman in the Basic Sciences Departments.

43. These Position Data Questionnaires were evaluated by the Exempt Salary Administration Committee of the University. This Committee is commonly known as the "Hay Committee" in recognition of Hay and Associates, the firm that established the benchmark system used by the University to evaluate exempt positions.

44. The Administrative and Professional Position Data Questionnaires were reviewed by the Hay Committee and the posi-

**1162**

tions were determined to be essentially the same, with ratings on a point scale as follows:

| | |
|---|---|
| Anatomy & Neurobiology (Sappington) | 466 points |
| Biochemistry (Colson) | 451 points |
| Microbiology & Immunology (Banton) | 451 points |
| Pharmacology (Hatton) | 451 points |
| Physiology & Biophysics (Holland) | 451 points |

45. However, Hay scores do not suggest job equality but only a composite judgment by members of the Hay Committee that two positions having the same score are of approximately the same job size. Completely unrelated positions may be assigned the same score by the Hay Committee.

46. The Hay Committee is composed of individuals having expertise in the field of human resources as well as those lacking expertise in that area.

47. Hay Committee proceedings are often characterized by extensive discussion, disagreement as to what score should be assigned to a particular position, and assignment of scores through compromise between disagreeing members of the Committee.

48. It is noteworthy that in assigning a Hay score the Hay Committee does not consider quality or quantity of job related experience or education level of the person in the position being evaluated.

49. Hay scores are utilized by the Department of Human Resources to determine suggested pay ranges for specific jobs.

50. Nonetheless, the Hay Committee evaluations are relevant because they tend to show that these five Assistant to the Chairman positions are of the same size and, since their job core functions are the same, their relative sizes have evidentiary value.

51. The court finds that the job duties of the plaintiffs and Gene Banton were essentially the same. These positions required substantially equal skill, effort and responsibility. Each job was performed under substantially equal working conditions.

52. On January 14, 1985, Dr. Terrance Cooper was employed by the University as Chairman of the Department of Microbiolo-

gy and was recruited to the University for the purpose, among others, of directing the establishment and operation of a center of excellence in microbiology.

53. In late March of 1988, the position of Assistant to the Chairman in Microbiology and Immunology was announced at the University and in *The Commercial Appeal.* Dr. Terrance Cooper, Chairman of the Department of Microbiology and Immunology, requested that the job be filled in order to replace Catherine Taylor who had left the department on October 2, 1986.

54. The position had been held vacant for one and one-half years by Dr. Cooper.

55. A Personnel Requisition Form was completed by the Department of Microbiology and Immunology, and authorization for the hiring was received by the College of Medicine.

56. Dr. Cooper determined that the person hired to fill this position should have the following qualifications:

Requires B.A. degree in marketing, public administration or equivalent management level experience. MBA preferred. Must have 3–5 years of supervisory experience, excellent communication and organizational skills and strong accounting. Financial and budgeting skills. Knowledge of and experience with computerized billing and scheduling system. Prefer someone with strong supervisory skills.

57. Dr. Cooper was informed on March 29, 1988 that the salary range suggested by the University's Department of Human Resources for the position of Assistant to the Chairman in Microbiology and Immunology was $20,023 to $25,028.

58. Kathy Hardin Davis, Employment Counselor in the Department of Human Resources, was responsible for processing the applications and selecting, from among the applicants, persons to be interviewed by Dr. Cooper.

59. Ms. Davis selected candidates for interview based on the qualifications evidenced in their applications or resumes.

60. Ms. Davis selected three applicants for interview, including Gene Banton.

61. Banton met the required minimum qualifications for the position of Assistant to the Chairman, possessing a bachelor's degree and having a number of years of relevant job experience. In addition, Banton possessed a Master of Science degree with a concentration in personnel and industrial/organizational psychology.

62. Banton's master's degree was relevant to the position, particularly in view of the personnel management needs of the Department of Microbiology and Immunology.

63. On April 13, 1988, Banton was interviewed by Dr. Cooper.

64. Dr. Cooper determined, on the basis of Banton's qualifications and interview results, that Banton was one of the two best qualified persons for the position and should be offered the job.

65. Dr. Cooper negotiated salary with Gene Banton before Banton was hired.

66. Although the salary range originally recommended by the Department of Human Resources for this position was $20,023 to $25,028, Dr. Cooper was of the opinion that Banton would not accept the position for a salary in that range.

67. Dr. Cooper therefore sought and received the approval of Dr. James New, Associate Dean for Administration of the College of Medicine, to offer Banton the maximum amount budgeted for fiscal 1988–89 for the position by the department, $34,000.

68. Gene Banton was hired by Dr. Cooper on or before May 11, 1988, as the Assistant to the Chairman in the Department of Microbiology and Immunology at a starting salary of $34,000. The salary was not approved by any employee in the Department of Human Resources. Mrs. Taylor was earning $29,075.04 when she left the department.

69. As of May 11, 1988, the salaries of the various Assistants to the Chairmen in the Basic Sciences Departments were as follows:

| | |
|---|---|
| Sue Hatton | $31,435 |
| Carolyn Holland | 31,440 |
| Garnette Sappington | 30,096 |
| Cheryl Colson | 30,030 |
| Gene Banton | 34,000 |

70. The Microbiology Prioritized Request for fiscal year 1987–88 requested $32,000 for the salary of the Assistant to the Chairman. The line item approved in the actual Microbiology budget for fiscal year 1987–88 was $30,000 for the vacant position filled by Gene Banton at $34,000. None of the $30,000 had been spent in the earlier part of 1987–88 and the increase thus was not in excess of the full annual budget amount.

71. On May 6, 1988, before Gene Banton accepted the offer and was hired, Bobby Thomas talked to Dr. New, who was then Associate Dean of the College of Medicine, about the hiring of Banton and the proposed salary. Thomas had concerns about the compensation level of Banton being higher than the other Assistants to the Chairmen in the Basic Sciences Departments in the College of Medicine.

72. In this conversation, Dr. New told Thomas that he was approving the salary because that is what he had agreed upon with Dr. Cooper, and that Banton was coming in under adverse conditions which warranted a higher salary.

73. In the conversation, Thomas informed Dr. New that Dr. Colson, an Associate Dean, had attempted to maintain the salaries of the Assistants to the Chairmen at the same level.

74. In the conversation, Thomas also advised Dr. New that the Banton salary would create problems because it caused a pay disparity.

75. On June 6, 1988, plaintiff Hatton's department chairman, Dr. Heimberg, sent a letter to Dr. Summitt to "again request appropriate compensation for Sue Hatton." In this letter, Dr. Heimberg complained about the hiring of Banton at $34,000, and stated that this action was "obviously inappropriate, discriminatory, and should be corrected." Dr. Heimberg reiterated his concerns in a follow-up letter to Dr. Summitt on July 5, 1988.

76. Longevity pay is not a factor in determining salaries at the University.

77. As of May 11, 1988, the University's own salary plan authorized the following salary range for the position of Assistant to the Chairman in the Department of Microbiology and Immunology:

| Minimum Salary | Mid–Range | Maximum Salary |
| --- | --- | --- |
| $20,023 | $25,028 | $30,033 |

78. The University's practice is that, as a rule of thumb, a new employee should not receive a salary above the mid-point in the salary range authorized for the position in which they are hired.

79. Gene Banton's starting salary was $3,967 above the maximum salary authorized for the position of Assistant to the Chairman.

80. On or about July 1, 1988, Sue Hatton received a $3,000 merit increase. The parties stipulate that this increase had nothing to do with the salary of Gene Banton.

81. On or about July 1, 1988, two of the other females in Assistant to Chairmen positions, Cheryl Colson and Garnette Sappington, each received a $3,000 merit increase. The parties stipulate that these increases had nothing to do with the salary of Gene Banton.

82. Finally, in September of 1988, Carolyn Holland received a $3,000 merit increase which was made retroactive to July 1, 1988. The parties likewise stipulate that this increase had nothing to do with the salary of Gene Banton.

83. Banton received an increase of $1,190.12 on July 1, 1988, at which point his salary was approximately $750 higher than the plaintiffs.

84. The University has never had a policy of increasing salaries because of educational degrees. The University generally pays a salary based upon the job description and not the person in the job.

85. In the past, the University has not paid a greater salary to any particular Assistant to the Chairmen because of that person's advanced degree.

86. Defendants contend that the reason that Gene Banton was paid more than Hatton and Holland is that he had higher educational degrees and longtime related experience. It is true that Banton had a master's degree that had some relevance to his new job and a number of years of experience that would be of benefit to his new duties. The court is not, however, convinced that these factors were the underlying reason for his higher salary. Educational achievements were not recognized by the University as a reason for current employee pay increases and experience on the job (longevity) is also not a factor in determining the current employees' salaries. The education and experience of Gene Banton may have been factors in Dr. Cooper's decision to choose Banton over the other candidates, but the evidence does not preponderate in favor of a finding that these factors were the basis for the higher salary. No evidence at all suggests that Banton's degree and outside job experience compel a finding that he was better qualified overall than Hatton or Holland to perform substantially the same job. Indeed, with all the accolades received by Ms. Hatton, and to a lesser extent Ms. Holland, and their long experience in the Assistant to the Chairmen positions, it is not surprising that no one directly makes this contention. Over the years Hatton was described as "Couldn't possibly be better" and "Excellent in all respects." Holland was described as "She has been exceptional."

87. The court is not convinced by a preponderance of the evidence that Gene Banton was paid more than the other Assistants to the Chairmen because of his master's degree and job experience. The court does not believe that the defendants deliberately, intentionally or willfully decided to pay Gene Banton more money because he was a male. The evidence does not support such a finding by a preponderance of the evidence. However, the evidence does indicate that Banton was paid more than were his female counterparts because it was felt that he would demand more for the same job and would not be willing to accept the lower pay accorded to the women who held this same job, a factor related to cultural beliefs to which this statute is aimed—that

men are entitled to and must be paid more money for the same job that women perform for less pay.

88. Defendants contend that they have paid Julie Sutch, a female Assistant to the Chairman with a master's degree, more than Gene Banton. Therefore, it is contended, they could not be discriminating on the basis of gender.

89. The position held by Julie Sutch is simply not the same job, even though she has the same job title. First, Ms. Sutch works in a completely different College. Second, Ms. Sutch holds the position of Director, with its attendant duties, as well as that of Assistant to the Chairman. Third, in determining salary, Ms. Sutch's position is in a functional area of Communication, University Relations, Development and Alumni Affairs, rather than the functional area of "Varied Administrative" where plaintiffs and Mr. Banton are employed. The Communication area pays at a rate substantially higher than the "Varied Administrative" positions. Therefore, Ms. Sutch's position, and her salary, are not a compelling comparison.

90. The court finds that, beginning on May 11, 1988, both plaintiffs were paid a substantially lower salary than Mr. Banton, their male counterpart. Based on the salary information presented, this has resulted in plaintiff Hatton receiving $2,884 less than Banton through the date of trial. Likewise, plaintiff Holland has been paid $2,869 less than Mr. Banton during this same time period.

## CONCLUSIONS OF LAW

Plaintiffs' claim is that defendants discriminate against them on the basis of sex by paying them lower wages and compensation than their male counterpart at the University. Plaintiffs assert that this discriminatory treatment constitutes a violation of both the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.* The court agrees, and makes the following conclusions of law:

### *The Equal Pay Act Claim*

■ A violation of the Equal Pay Act is established where it is shown that the "employer pays different wages to employees of opposite sexes for 'equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions' ". *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir.1981).[1]

A prima facie case is established by examining the jobs held by the female and male employees and showing that these jobs are substantially equal in skill, effort, and responsibility. *Odomes, supra; Keziah v. W.M. Brown & Son, Inc.,* 888 F.2d 322, 324 (4th Cir.1989).

■ Unlike a claim under Title VII, plaintiffs' Equal Pay Act claims are not dependent upon a showing of discriminatory intent. *Odomes, supra; see also Maxwell v. City of Tucson,* 803 F.2d 444 (9th Cir.1986). Rather, once plaintiffs have established that they were paid less than their male counterpart for performing, under similar working conditions, jobs requiring substantially equal skill, effort and responsibility, then the burden of proof shifts to defendants to prove that the pay differential is justified under one of the four statutory exceptions found in 29 U.S.C. § 206(d)(1). *Corning Glass Works,* 417 U.S. at 196–97, 94 S.Ct. at 2229; *accord*

---

1. 29 U.S.C. § 206(d)(1) (1988) provides:

No employer ... shall discriminate ... between employees on the basis of sex by paying wages ... at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; Provided, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

*Fallon v. State of Illinois,* 882 F.2d 1206, 1213 (7th Cir.1989); *Odomes,* 653 F.2d at 251.

■ While defendants deny that the positions in question were "substantially equal" within the meaning of the Act, the weight of the evidence in this case establishes that they were. The jobs share a common core of duties, and the minor differences reflected to exist from time to time which were mainly a matter of emphasis, are not sufficient to justify a holding that the jobs are not substantially equal. It is not necessary that the jobs be identical. Rather, there need only be a "substantial" equality of skill, effort, responsibility and working conditions. *Odomes,* 653 F.2d at 250; *Corning Glass Works,* 417 U.S. at 203 n. 24, 94 S.Ct. at 2232 n. 24. Given that the disparity in compensation is undisputed, a prima facie case is thus established.

■ Once a prima facie case is established, the burden shifts to defendants to prove by a preponderance of the evidence that the wage disparity was based on one of the four statutory exceptions, i.e., (1) a seniority system, (2) a merit system, (3) a system setting earnings according to quality or quantity of production, or (4) "any factor other than sex." 29 U.S.C. § 206(d)(1); *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. at 2229; *Odomes,* 653 F.2d at 251.

Defendants raise an affirmative defense under the fourth exception only; that is, "any factor other than sex." Defendants contend that two factors other than sex justified Gene Banton's higher salary—his education and his work experience. The burden on defendants to prove this affirmative defense is a "heavy one." *Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1029 (6th Cir.1983) (citing Department of Labor Regulation 29 C.F.R. § 800.142 (1974)), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984).

■ This court's job in an Equal Pay Act case is not to substitute its judgment for the employer's judgment. Prior experience

and education are factors that an employer may utilize in determining whether to pay any applicant more than other employees in the same job, but in this case the evidence is not convincing that these factors, as opposed to Mr. Banton's sex, were the reason his salary was set several thousand dollars higher than the female plaintiffs, whose exemplary and outstanding records on the job had put them at the top rung of the pay scale accorded to the five Assistant to the Chairmen positions.

The court concludes that defendants have not met their burden of proving by a preponderance of the evidence that the salary disparities at issue were based on a factor other than sex. The burden on defendants is to establish that "the factor of sex provides *no part* of the basis for the wage differential." *Bence,* 712 F.2d at 1029 (emphasis added). Defendants have not carried this burden.

Rather, the great weight of the evidence establishes, and the court is convinced, that the factor of sex was an underlying if unintentional basis for the disparity in salaries.

No conclusion is reached by this court that the University must pay the same salary to the Assistants to the Chairmen if factors other than sex are shown to be used to determine those differences. That is the University's prerogative, as it should be, but such factors have not been convincingly established in this particular case.

### The Title VII Claim

Plaintiff Hatton also claims that defendants' payment of a higher salary to Gene Banton constitutes a violation of Title VII's prohibition against sex-based discrimination in compensation. 42 U.S.C. § 2000e–2(a).

■ The Title VII claim differs from the Equal Pay Act claim to the extent Title VII requires plaintiff to establish by a preponderance of the evidence that any wage disparity was the result of discriminatory intent.[2]

2. Plaintiff's Title VII claim is one of disparate treatment as opposed to disparate impact. The

■ Under Title VII, plaintiff's prima facie case is established by showing that she and other females were paid substantially less than Banton, a male, for performing in the same position. The prima facie case here is established on the same facts as in the Equal Pay Act claim discussed above.

■ At this point, the analysis differs. The burden on defendants under Title VII is less onerous in that they simply have to articulate a legitimate, nondiscriminatory reason for the wage disparity. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[3] Again, the factors of education and experience constitute defendants' articulated nondiscriminatory reasons for the wage disparity.

■ Once defendants have articulated legitimate nondiscriminatory reasons, plaintiff must prove that the reasons proffered were mere pretext for discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Daniels v. Bd. of Educ. of Ravenna City School Dist.*, 805 F.2d 203, 207 (6th Cir. 1986). Pretext may be shown either directly by persuading the court that a discriminatory reason more likely motivated defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence. *Id.* The plaintiff Hatton, however, carries the burden of persuasion throughout a Title VII case and here the court has not been convinced that defendants intentionally chose to discriminate against her on account of her sex. The plaintiff has failed to prove intentional pretext by a preponderance of the evidence. Thus, plaintiff has not met her burden of showing that defendants' proffered explanation of the salary disparity is merely pretext.

The court finds that the wage disparity is not shown to constitute a violation of Title VII.

### Appropriate Relief

The court having found that defendants' action violates the Equal Pay Act, plaintiffs are entitled to the following relief.

Plaintiffs Hatton and Holland are entitled to backpay under the Equal Pay Act pursuant to 29 U.S.C. § 216(b). Under the circumstances of this case, plaintiffs are entitled to recover backpay from May 11, 1988, the date Gene Banton was hired at a higher salary, through the present. Plaintiffs are also entitled to have their pensions adjusted to reflect the resulting increase in salary during this time period. Appropriate backpay is the difference between what plaintiffs have earned and what Banton earned or would have earned but for his transfer.

Plaintiffs argue that the court must disregard the $3,000 merit raise, which they received July 1, 1988, in awarding backpay. The Act requires equal pay, not that the reasons for equal pay be based on an intent to comply with the Act. For whatever reasons, as of July 1988 plaintiffs received

---

various circuits have differed as to the proper analysis of such concurrent claims. *See Fallon v. State of Illinois*, 882 F.2d 1206, 1213–18 (7th Cir.1989) (containing a discussion of the differing treatment of concurrent claims by the courts). Several circuits, as well as the Equal Employment Opportunity Commission, have reasoned that a finding of liability under the Equal Pay Act leads "automatically" to liability under Title VII. Other courts, notably the Seventh Circuit in *Fallon*, have required plaintiffs to also establish discriminatory intent through the traditional Title VII allocation of proof. The Sixth Circuit has not directly addressed this point. This court concludes that discriminatory intent must be proved under Title VII.

**3.** Section 703(h) of Title VII incorporates the "affirmative defenses" contained in 29 U.S.C. § 206(d), *Fallon*, 882 F.2d at 1216, and provides:

Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply different standards of compensation ... pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of ... sex.... It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 206(d).

substantial raises in excess of the raise Banton received and much of the disparity between their salaries and his was dissipated with those raises. The court does not have authority under this Act to compel merit raises, only to insist that the congressional edict of equal pay be met.

■■■ From May 11, 1988 to June 30, 1988, plaintiff Hatton received $345 less than Banton. From July 1, 1988 to June 30, 1989, Hatton received $755 less. Although the evidence is not overly clear, it appears that this disparity continued and slightly increased with two annual 4% raises in 1989 and 1990, resulting in a total disparity to September 15, 1991 of $2,884, an amount Hatton is entitled to recover as backpay.

Similarly, plaintiff Holland's differential to July 1, 1988 was $345. Thereafter she was paid $5 more per year than Hatton so that her differential from Mr. Banton's salary in 1988–89 was $750; in 1989–90, $781; in 1990–91, $823; and to September 15, 1991, approximately $170. Plaintiff Holland is entitled to recover $2,869, as backpay.

Liquidated damages of double the backpay award are provided by statute. In order to avoid an award of liquidated damages, defendants must convince the court that their actions were "in good faith and that [they] had reasonable grounds for believing that [their] act or omission was not a violation" of the Act. 29 U.S.C. § 260. This court's discretion to deny liquidated damages can only be asserted

> if the employer [can] meet the "substantial burden" of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance. If the employer cannot convince the court in these respects, an award of liquidated damages remains mandatory.

*E.E.O.C. v. Shelby County Government,* 707 F.Supp. 969, 987 (W.D.Tenn.1988) (quoting *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 464–65 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978)). Under this standard, both plaintiffs are entitled to, and the court awards, liquidated damages in an amount equal to their individual backpay awards.

Sue Hatton is awarded a total of $5,768 and Carolyn Holland is awarded a total of $5,738.

Defendants are further ordered to set plaintiffs' salaries at a salary level which equals or exceeds salary paid to Gene Banton at the time he ceased to be an Assistant to the Chairman, plus any raises that were accorded to all of the five Assistants to the Chairmen after that time.

As the prevailing parties, plaintiffs are entitled to recover their reasonable attorneys' fees and costs. Counsel for plaintiffs shall submit, within 20 days of the entry of this order, an appropriate petition and materials in support of their requested attorneys' fees and costs. Defendants shall have 10 days thereafter in which to submit any response.

Defendants shall compute the ongoing current salary and submit to plaintiffs for their approval within ten (10) days following entry of these findings and conclusions. If the parties are unable to agree, defendants shall file a memorandum with the court on their position within twenty (20) days after entry of this order and plaintiffs shall respond within five (5) days. Memoranda shall not exceed five (5) pages.

IT IS SO ORDERED.